**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL T. KEISER,** | : | **Civil No. 1:15-CV-450** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **THE BOROUGH OF CARLISLE,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I. INTRODUCTION

Did the nearly 30-year career of a local government employee come to an end as the result of declining performance and interpersonal disputes, or was it instead undone by his supervisor's invidious age-based discrimination and retaliation? This action presents that question for resolution.

The plaintiff in this action, Michael Keiser, worked for 27 years as the Director of Public Works for the Borough of Carlisle before he was fired on May 1, 2014, just hours after formally complaining to his supervisor about what he perceived as his supervisor's repeated ageist and discriminatory comments and criticism. Keiser alleges that his firing constituted unlawful age discrimination and was retaliatory.

The Borough, and Keiser's supervisor, Mathew H. Candland, Sr., maintain that Candland was compelled to terminate Keiser's employment because it had become impossible to work cooperatively with Keiser; because of fundamental disagreements over significant public-works projects; and because morale had reached an unacceptable low within Keiser's department.  Keiser retorts that these given reasons are pretextual cover for his unlawful firing, which is belied by evidence of Candland's discriminatory comments and other evidence in the record that cast doubt on Candland's articulated justification.

Keiser brought this federal civil action on March 4, 2015, bringing claims for discrimination and retaliation under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 ("ADEA").  After engaging in discovery and an unsuccessful effort at negotiating a settlement of the claims, the Borough has moved for summary judgment, arguing that Keiser lacks sufficient evidence to support either his discrimination or retaliation claim.  The motion is fully briefed and is ripe for disposition.

Following careful review of the parties' briefs, factual statements, and citation to record evidence, the Court finds that this case is riddled with factual disputes that make summary judgment inappropriate.  Accordingly, for the reasons that follow, the Borough's motion will be denied and the case will be set for trial.

## II.  <u>BACKGROUND</u>

The factual background to this memorandum is taken from the parties' statements of material fact, to the extent there is no dispute, and where the record is disputed, it has been construed in the light most favorable to the plaintiff as the non-moving party, for purposes of resolving the pending motion only.

Michael Keiser was born in 1954.  He began working for the Borough of Carlisle on November 16, 1987, when he was hired as its Public Works Director and Borough Engineer.  (Doc. 38-2, Deposition of Michael T. Keiser at N.T. 8.) By objective accounts, and during employee reviews, his performance was rated as having met or exceeded expectations at all times with one exception, when he received some criticism in a December 2013 evaluation.  (Pl. App'x in Support of Reply to Def.'s Concise Statement of Material Facts ("Pl. App'x."), Ex. A ¶ 4; Keiser Dep., N.T. 55.)  Owing to his performance with the Borough, the Keiser was appointed as Interim Borough Manager from June 14, 2007, to February 2, 2008.  The Borough Council was evidently pleased with Keiser's performance in this interim role, and asked him to accept a permanent appointment as Borough Manager, but Keiser declined because he felt he could best serve the Carlisle community as Public Works Director and Borough Engineer.  (Keiser Dep. N.T. 13, 17.)

3

At the time of his hire, and at all times going forward, Keiser reported directly to the Borough Manager. (Doc. 38-4, Deposition of Mathew H. Candland N.T. 24-26.) In July 2012, Mathew H. Candland was hired as the Borough Manager. (*Id.*, N.T. 22.) Keiser reported to Candland from the date of Candland's hire until May 1, 2014, when Candland fired Keiser. (Id., N.T. 24-26; Doc. 38-5, Ex. 22.) According to a number of witnesses other than Keiser himself, the plaintiff was judged to be able and competent over the course of his employment with the Borough. (Doc. 38-8, N.T. 16, 56-58; Doc. 38-14, N.T. 40-42; Doc. 38-13, N.T. 12-15; Doc. 38-11, N.T. 21-23, 28-29, 38-39; Doc. 38-16, N.T. 16-19, 74-75, 100, 143-144; Doc. 38-6, N.T. 159-160.)

Notwithstanding a long career with Borough that was adjudged consistently to be meeting or exceeding expectations, after Candland's arrival Keiser contends that he was subjected to heightened and unreasonable levels of scrutiny, which he had not previously experienced. He also claims that during this time Candland routinely made critical remarks that reflected ageist and discriminatory bias against Keiser as an older employee, referring to him or his work as "outdated", "old school", "old fashioned" and "antiquated", and these remarks were attested to by multiple Borough employees who testified in this action. (Doc. 38-6, N.T. 68-69; Doc. 38-13, N.T. 26-29, 36-37, 48, 52-55; Doc. 38-9, N.T. 54; Doc. 38-2, N.T. 95,

99, 101-102, 107-109, 194; Doc. 38-3, Ex. Z.)  Candland has admitted that he used such terms to refer to Keiser and his work.  (Doc. 38-4, N.T. 62-64.)

The Valley Meadows Storm Water project was a flashpoint between Keiser and Candland.  (Doc. 38-13, N.T. 53-54.)  The project was part of an unfunded initiative undertaken by Keiser and the Public Works Department to abate flooding from storm water in the Valley Meadows neighborhood and a surrounding park, which had been a known issue in the community for more than 40 years.  (Doc. 38-2, N.T. 158-159; Doc. 38-11, N.T. 42-44; Doc. 38-15, N.T. 125; Doc. 38-13, N.T. 19.)  The evidence indicates that the project had succeeded in mitigating the problem the pooling storm water had presented to homes in the Valley Meadow, as they no longer experienced flooding and other property damage following the effort.  (Doc. 38-6, N.T. 110-111; Doc. 38-11, N.T. 56; Doc. 38-9, N.T. 32; Doc. 38-13, N.T. 20-21; Doc. 32-2, N.T. 162.)  Nevertheless, Keiser and others have observed that Candland denigrated the Valley Meadows project and Keiser's handling of it.  They also have testified that Candland's ageist views of Keiser as a manager, reflected in the use of the terms "outdated", "old school", "old fashioned", and "antiquated" extended beyond this single project to include his management of repairs at the Gatehouse and Amphitheater at Thornwald Park, among other projects.  (Keiser Dep., N.T. 101-102, 107-108, 194; Doc. 38-5, Ex. 8.)

After Candland was brought on, other Borough employees had concerns about their own job security, and attested that it was common knowledge among Public Works employees that Candland would "rather start over with younger guys and have them, you know, be groomed the way he likes to see it instead of, you know, some of the older ways of thinking." (Doc. 38-13, N.T. 26.) Employees testified that they worried about losing their jobs because of their advancing age. (N.T. 38-14, N.T. 32; 38-12, Deposition of Theodore Weber ("Weber Dep.") N.T. 45; Doc. 38-13, N.T. 28-30.) For his part, Keiser attested that he informed Candland multiple times that he was offended by what he considered Candland's ageist remarks. (Keiser Dep., N.T. 95-99, 107-115.) Notwithstanding Keiser's efforts to address the matter, he claims that this served only to intensify Candland's unjustified scrutiny of him and his work, resulting in an unfavorable Annual Performance Evaluation. (Doc. 38-5, Ex. 8.) Prior to his eventual termination, this performance evaluation represented the only time in Keiser's entire time of employment with the Borough when he was subjected to an unfavorable review, and he maintains that it was issued in keeping with Candland's written plan "to replace maturing staff (with particular focus on replacing leadership.)" (Doc. 38-5, Ex. 2.)

Even after this negative evaluation, Keiser and Candland continued to discuss, and in many instances disagree about, the management of the Valley

Meadows project.  (Doc. 38-5, Exs. 10, 14.)  The plaintiff describes these conversations as "spirited and passionate," whereas the Borough has characterized them as impolite, disrespectful and needlessly confrontational, confirming that Keiser was unwilling to work cooperatively with Candland and others on important matters.  The plaintiff has, however, cited to testimony showing that other Borough employees who observed these conversations did not consider Keiser's interactions with Candland to be "combative".  (Doc. 38-6, N.T. 73-74.)

In the spring of 2014, shortly before he would be fired, Keiser maintains that he had no inkling that his job was in jeopardy.  He notes that he had not been disciplined at any time during Candland's two-year tenure as Borough Manager, and it appears that Candland never informed the plaintiff that his job was in danger.  (Doc. 38-6, N.T. 115, 126; Doc. 38-2, N.T. 179-180; Doc. 38-3, Ex. DD.)  Keiser and the Borough's Human Resource and Risk Manager, Thomas Hamilton, separately confirmed that Keiser had not received any formal discipline by Candland prior to his employment being terminated.  (Doc. 38-6, N.T. 115; Keiser Dep., N.T. 179-180.)

On April 28, 2014, three days before Keiser was fired, the Borough Council held an Executive Session meeting.  (Doc. 38-8, N.T. 33.)  During that executive session, Council members Linda Cecconello and Donald Grell testified that there was no plan to terminate Keiser's employment at that time.  The issue came up

because of Candland's review of the plaintiff's performance and because of an issue between Keiser and a neighbor which had received some local media attention. (Doc. 38-9, N.T. 76.)  According to Cecconello, Candland explicitly told the Council that "Mike's job was not in jeopardy . . . That was a direct quote." (Cecconello Dep. at 71-74.)  Councilman Grell testified similarly that Candland made clear at the Executive Session that Keiser "wasn't going to be fired."  (Doc. 38-8, N.T. 34.)  However, in light of some of the issues that had been discussed, Candland scheduled a meeting with Keiser on May 2, 2014.  (Doc. 38-4, N.T. 206-207; Doc. 38-5, Ex. 14.)

This meeting was moved up to May 1, 2014, at Keiser's suggestion, and in connection with the ongoing dialog between the two men regarding the Valley Meadows project.  The meeting was held in the morning and was attended by Keiser, Candland and Hamilton.  The meeting apparently concluded without any resolution on the disagreement concerning the project's direction, with Keiser offering to "agree-to-disagree" with Candland on the matter.  (Doc. 38-2, N.T. 185.)  According to Keiser, during the remainder of the meeting, Candland scrutinized his other work on the Gatehouse and Amphitheater projects and did so by using derogatory and ageist terms to describe him and his work.  (Keiser Dep., N.T. 194.)  At that time, Candland concluded the meeting and told Keiser to return

to work.  Keiser was not fired at that time.  (Doc. 38-2, N.T. 187; Doc. 38-6, N.T. 138.)

Keiser contends that he felt compelled to lodge a formal written complaint for age discrimination due to Candland's repeated use of discriminatory and ageist remarks about him and his work.  (Doc. 38-2, N.T. 111, 119.)  Before he returned to work, Keiser hand-delivered a complaint of age discrimination to Candland, with Hamilton present.  He attested that he did so because he had endeavored to address the problem with Candland informally, and had been met in response with further, unabated ageist remarks, harassment and discrimination.  (Doc. 38-2, N.T. 194; Doc. 38-6, N.T. 140.)  Keiser read his written complaint aloud to Candland and Hamilton, and then returned to work.  (Doc. 38-2, N.T. 188.)

That afternoon, at approximately 3:00 p.m., Candland approached Keiser and asked him to attend another meeting that day.  (Id., N.T. 189-190.)  When he showed up at this meeting, Candland informed him that he was fired, reading aloud the termination letter to Keiser.  (Doc. 38-5, Ex. 22.)  According to Keiser, he was in shock after being terminated, noting that prior to that day "there was never any discussion, any disciplinary action, any threat of disciplinary action, any threat of termination based on the three issues [listed in the termination letter] . . . ."  (Keiser Dep. N.T. 179.)  For his part, Candland has acknowledged that he had at no point committed to writing his plan to terminate Keiser's employment prior to this time,

9

and the Borough has produced no evidence to show that Keiser's employment was in jeopardy.  (Candland Dep. N.T. 223.)  Quite the contrary, as noted, two Council members have attested that at a meeting with Candland, he revealed no plans either to discipline Keiser or terminate his employment, and in fact had told the Council that Keiser' job was not in jeopardy as of April 28, 2014.[1]

This litigation followed on March 4, 2015, with the plaintiff filing a two-count complaint alleging that the Borough violated the ADEA by discriminating against him on the basis of age and for retaliating against him after he protested Keiser's allegedly ageist and discriminatory treatment.

Following discovery, the Borough filed the instant motion for summary judgment on November 8, 2016.

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating a motion for summary

---

[1] The Court recognizes that the Borough has presented a factual narrative that stands in marked contrast to the one presented above.  However, under the law as the nonmoving party, Keiser is the party who receives the benefit of the doubt at summary judgment with respect to disputed issues of fact, and the factual record contains evidence that supports Keiser's version of events.  The Court is making absolutely no factual findings in ruling on the motion, but is simply considering the evidentiary record in the light most favorable to Keiser as the non-movant, as we are legally required to do.  Thus, we simply highlight that there plainly exist competing factual narratives in this litigation that make it inappropriate for resolution on a summary judgment motion.

judgment, a court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law." *Macfarlan v. Ivy Hill SNF, LLC.*, 675 F.3d 266, 271 (3d Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A disputed issue is only "genuine" if there is a sufficient evidentiary basis upon which a reasonable factfinder could find for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" only if it could affect the outcome of the suit under the governing law. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (citing *Gray v. York Papers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)). The Court is not tasked with resolving disputed issues of fact, but only with determining whether there exist any factual issues that must be tried. *Anderson*, 477 U.S. at 247-49.

In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Macfarlan*, 675 F.3d at 271; *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770 (3d Cir. 2009). Where there exist factual issues that cannot be resolved without a credibility determination, the court must credit the non-moving party's evidence over that presented by the moving party. *Liberty Lobby*, 477 U.S. at 255. However, if there

is no factual issue presented, and if only one reasonable conclusion could arise from the record with respect to the potential outcome under the governing law, the court must award summary judgment in favor of the moving party. *Id.* at 250.

The court must review the entire record, but in doing so must take care to "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150-51 (2000). The task for the court is to examine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

Furthermore, in cases involving allegations of employment discrimination, such as this one, the foregoing standard of review is applied with special care because the intent and credibility of parties are typically crucial. *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 325 n.9 (3d Cir. 2003). In undertaking this review, the court avoids making credibility determinations and does not weigh the evidence, and instead must take care to accept as true the non-movant's evidence and draw all inferences in his favor. *Liberty Lobby,* 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

## IV.   **DISCUSSION**

The Borough argues that it is entitled to summary judgment on both the discrimination and retaliation claim alleged in the complaint.   These claims, and the Borough's arguments, are addressed separately below.

### A.   **Discrimination**

The ADEA prohibits employers from taking adverse employment action against an employee who is at least 40 years old, 29 U.S.C. § 631(a), "because of such individual's age."   29 U.S.C.  § 623(a).   A plaintiff alleging that he was subjected to adverse employment action, such as a termination, in violation of the Act must show that his "age was the 'but-for' cause of the employer's adverse action."   *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).   It is not enough for a plaintiff to show that his age was a factor that motivated the employer's action, but instead must point to evidence that could support an inference that his age had a "determinative influence" on the decision.   *Id.* at 176.   This burden remains squarely with the plaintiff, who may prove his claims through direct or circumstantial evidence. *Id.* at 177.

Prior to the Supreme Court's decision in *Gross*, the Third Circuit had instructed that direct evidence of age discrimination meant "evidence sufficient to allow the jury to find that 'the "decision makers placed substantial negative reliance on [the plaintiff's age] in reaching their decision to fire him.'"   *Fakete v.*

*Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)).  *Gross* fundamentally changed this and now it is clear that " 'substantial negative reliance' on age is not enough [to prove discrimination in violation of the ADEA]; the evidence must be a sufficient basis for a reasonable jury to conclude that age was the determinative, but-for cause of the employee's termination."  *Palmer v. Britton Industries, Inc.*, 662 F. App'x 147, 151 (3d Cir. Nov. 7, 2016).

While this is an exacting burden of proof, a plaintiff may also prove age discrimination through circumstantial evidence, and when he does so the court applies the familiar burden-shifting framework announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  The Third Circuit has explained application of *McDonnell Douglas* in the context of ADEA discrimination claims as follows:

> Under *McDonnell Douglas*, the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.  Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate nondiscriminatory reason for the adverse employment action.  If the employer does so, the burden of production

14

> returns to the plaintiff to demonstrate that the employer's
> proffered rationale was a pretext for age discrimination.
> At all times, however, the burden of persuasion rests with
> the plaintiff.

*Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (citations omitted); *see also id.* at 691 (holding that this standard does not conflict with *Gross*).

In order to show pretext, "the employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). In order to "discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, product or competent." *Id.* at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilties, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' [*Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)], and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)." *Id.*

15

In this case, the parties agree that Keiser has met his burden with respect to the first three factors of the *prima facie* test.  The Borough argues, however, that Keiser has failed to show that he was replaced by a person who was sufficiently younger to support an inference of discriminatory animus.  The parties offer little on either side with respect to this issue, and the court finds that it is a disputed and relevant factual issue that alone cannot carry the defendant's burden on summary judgment.

The record is somewhat unclear regarding the exact ages of the employees who replaced Keiser after he was fired.  It appears that immediately following Keiser's termination, Candland assumed his duties.  It also appears that Candland may be a number of years younger than Keiser, although neither of the parties has made Candland's precise age clear to the court.  During his deposition he indicated that he graduated from high school in 1984 and shortly thereafter matriculated at Brigham Young University.  The parties seem to agree that he is substantially younger than Keiser.

The Borough notes that Candland subsequently hired Mark Malarich to serve as the Public Works Director, who was born in 1959 and is more than five years younger than the plaintiff, but older than Candland and substantially closer in age to Keiser.  The Borough suggests that Malarich's hiring undermines the charge of age-based discrimination, and argues that Keiser should be required to do more

16

to produce evidence that is suggestive of discrimination, since the evidence of an age disparity is slight.  Keiser responds, somewhat speculatively, that the Borough may have hired Malarich to replace Candland only after learning that Keiser was pursuing a claim of age discrimination, in order to make it appear that age did not affect the Borough's hiring decisions, and because other younger applicants were passed over in favor of Malarich, who was older than them.

Although the record evidence regarding the age disparity between Keiser and either Malarich or Candland is somewhat imprecise, and the role that age may have played in hiring decisions is clearly disputed, there is some evidence showing of sufficient age disparity among the men.  Keiser, who was born in 1954, was more than five years older than Malarich, (Doc. 38-1 at CB-000340), and the record strongly suggests that Candland was substantially younger than Keiser.

This presents, at least initially, something of a close issue.  In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), the Supreme Court explained that under the ADEA, a plaintiff cannot make out a *prima facie* case that would allow an inference of discrimination if the employee is replaced with another worker who is "insignificantly younger." Id. at 312-13.  The Third Circuit, in turn, has instructed that in order to meet the fourth prong's requirement that the plaintiff be replaced by a significantly younger individual, "there is no particular age difference that must be shown, but while different courts have held . . . that a

five year difference can be sufficient, . . . a one year difference cannot." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 307 (3d Cir. 2004) (quoting *Showalter v Univ. of Pittsburgh, Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999); *see also Showalter*, 190 F.3d at 235 ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age.").

In *Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995), the Third Circuit found that the district court had erred in finding that the plaintiff's prima facie case failed at the fourth prong, where the district court considered only the four-year difference between the plaintiff and his eventual replacement hire and failed to consider the fact that for several months before the plaintiff's replacement hire was brought on, a substantial portion of the plaintiff's job responsibilities had been assumed by an employee "well over ten years younger" than the plaintiff. The Third Circuit found that the combined differences in ages was "clearly sufficient" to satisfy the fourth prong of the prima facie standard by raising an inference of age discrimination. *Id.* at 730.

In this case, like *Sempier*, the plaintiff has pointed to evidence showing that after he was fired his job duties were assumed by Candland, who was not only the individual solely responsible for firing him but who was also many years younger and had, according to the plaintiff, made a number of comments suggesting that

Candland harbored an animus towards older workers.  Keiser has also noted that his official replacement who was hired some time later was at least five years younger than him, which courts have found in some cases is a sufficient differential.  *Monaco*, 359 F.3d at 307 (citing to cases recognizing that a five-year difference may be sufficient).  At this stage of the litigation, this evidence of age disparity, coupled with the other evidence in the record suggesting that Candland made a number of statements that Keiser and other Borough employees interpreted as evincing an age-based discriminatory animus, the court finds that there is sufficient evidence to support the plaintiff's *prima facie* showing of age discrimination.

Next, the Borough argues that even if Keiser has made a *prima facie* showing his discrimination claim fails as a matter of law because the Borough had good cause to terminate his employment, and that the evidence unequivocally shows a frayed working relationship between Keiser and Candland, and a number of areas in which Keiser had fallen short of performance expectations which justified Candland firing him after the latest blow up the two men had during their penultimate meeting, after which Keiser lodged a formal complaint.  The Borough contends that the fractured working relationship between Keiser and Candland is undisputed, and that they had significant differences of opinion about the direction in which to take certain important infrastructure projects.  The Borough also argues

19

that Keiser had difficulties with other department heads, which though not as serious as his working conflict with Candland, nevertheless existed in some way that the Borough maintains is not subject to any dispute.  In effect, the Borough urges the court to find that this evidence reflects as a matter of law that Candland would have had sound business reasons to terminate Keiser's employment, and therefore his decision in this regard is effectively beyond challenge in this litigation.

Keiser responds by noting that there is substantial evidence in the record to support his assertion that the Borough's stated reasons for his termination are post-hoc pretextual cover for Candland's discriminatory firing.  Keiser recognizes that the Candland has offered reasons for terminating his employment that are couched in business judgment, but counters that there is ample evidence to show that that the Borough's proffered reasons are not the real reason he was fired.

As noted, to show pretext, a plaintiff must come forward with evidence that would allow a factfinder to reasonably either disbelieve the defendant's articulated legitimate reasons, or otherwise believe that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 765.  This standard puts " 'a difficult burden on the plaintiff.' " *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765).  To carry this "difficult burden," a plaintiff is tasked with producing

evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."  Id.

Notwithstanding the difficulty of this burden, the court finds that Keiser has adduced sufficient evidence to have this case presented to a jury, and not to be decided on a cold record as a matter of law by the court, particularly where resolution of the disputed issues of fact turns so closely on the credibility of Keiser, Candland and other witnesses.

The court recognizes that the Borough has offered Candland's business judgment as a nondiscriminatory reason to justify Keiser's firing.  In general, a court "is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination."  *Menta v. Community Coll. of Beaver Cnty.*, 428 F. Supp. 2d 365, 373 (W.D. Pa. 2006) (citing *Ezold*, 983 F.2d at 527).  However, it is axiomatic that a court's deference to a defendant's business judgment is limited to lawful business purposes, and that a defendant's business judgment will not insulate an employer from liability for unlawful discrimination.  *See, e.g. Beaird v. Seagate Tech. Corp.*, 145 F.3d 1159, 1169 (10th Cir. 1998) ("The ADEA . . . does not immunize all potential business judgments from judicial review for illegal discrimination."); *EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th

Cir. 1997) (observing that the "decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision."). Thus, the court recognizes that the Borough has come forward with business reasons for its decision to fire Keiser – interpersonal disputes, as well as a fractured working relationship between Keiser and Candland – but the court nonetheless is obliged to consider the evidence that Keiser has highlighted, which he argues undermine the Borough's proffered business reasons, as well as evidence that could lead a factfinder to conclude that age-based discrimination is more likely than not the reason for the action taken. Further, we must consider this evidence in a light most favorable to Keiser, as the party opposing summary judgment.

Viewed through this lens, the court agrees with Keiser that the evidence that the Borough has relied upon to justify its employment action is almost entirely predicated on Candland's own testimony or assertions, and is therefore bound up in credibility determinations, matters which are the province of the jury. To justify Candland's assertion that Keiser was poorly managing the Borough's infrastructure needs and projects, the Borough cites to the evaluation of a professional engineering firm that concluded Keiser's approach to the Valley Meadows flooding issues was not going to work. (Candland Dep., N.T. 114-115.) As Keiser observes, however, the Borough has not supported this assertion with any

documentary evidence.  But more importantly, this assessment was provided <u>after</u> Keiser was fired, and thus it is difficult to see how it could have provided an informational basis for Candland's decision.   Furthermore, as Keiser notes, Candland did possess an opinion given by another professional engineering and environmental services firm, Skelly and Loy, which concluded that Keiser's approach to the project would have been effective.  (*Id*., N.T. 97-98.)  Candland, who does not have an engineering background and does not hold certificates in the fields of engineering and waste water management, declined to accept this particular opinion and concluded that it was defective.  (*Id*.; Doc. 38-2, N.T. 163, 174.)  This disparity in the record provides some basis to question the Borough's stated justifications.

Keiser also notes that although he received one equivocal performance review in December 2013 where Candland noted that he was "somewhat disappointed" in Keiser's job knowledge and performance, Keiser points out that he had never before or since received a negative job evaluation from the Borough, and that even after this tepid assessment, Keiser was never disciplined with respect to any aspect of his job performance.  (Keiser Dep., N.T. 179-80; Doc. 38-6, N.T. 115.)  Keiser also cites to the testimony of other witnesses who spoke to his competence, and perhaps most importantly he highlights deposition testimony which would show that just days before terminating his employment, Candland

had told two Council members that there was no plan or reason to terminate the plaintiff's job.  (Doc. 38-9, N.T. 71; Doc. 38-8, N.T. 34.)

The Borough also offers that it fired Keiser because he was insubordinate and had a toxic working relationship with Candland, yet problems in the relationship between Candland and Keiser are not identified in the May 1, 2014 termination letter, thus casting some doubt on this stated justification which was argued at length in the Borough's brief.  (Doc. 36, at 7-11.)  As Keiser notes, in *Fuentes* the Third Circuit found that inconsistencies in the employer's stated reason or explanation for its employment action may support an inference of pretext.  *Fuentes*, 32 F.3d at 764.  In this case, given that there are a number of questions regarding the proffered reasons for firing Keiser, and the fact that many of them rest on Candland's assertions alone, this inconsistency may be relevant to a factfinder in assessing the defendant's explanation.

The Borough also generally condemns Keiser as the person responsible for a morale problem within the Public Works Department, but here again the evidence is not only based entirely on Candland's testimony or assertion, but is in conflict with substantial other witness testimony who state that Candland was the source of the problem.  (Doc. 38-14, N.T. 36-37, 39; 38-13, N.T. 69-70; Doc. 38-11, N.T. 104-105, 107-108.)   Candland acknowledged that others felt that he was responsible for the Department's low morale, and he even acknowledged during

his deposition that the plaintiff was not "the cause of it" or the "sole reason" for low morale, but may have failed to manage it effectively.  (Doc. 38-4, N.T. 118.) Accordingly, there are, on the paper record, questions about the extent of the morale problem in the Department, and whether Candland and the Borough actually believed that Keiser was responsible for it, as is now being asserted. Given the equivocal nature of the evidence offered in support for the plaintiff's termination, coupled with the fact that much of this evidence is taken from Candland's assertions alone, and in some important respects either lacks support in the record or could be construed as a *post-hoc* rationalization for the action taken, the court finds that the appropriate means of resolving the plaintiff's discrimination claim is to have this evidence, and the other evidence that the plaintiff has adduced in support of his claims, is to have this evidence considered and evaluated by a jury.

The court's decision in this regard is also influenced, in part, by the fact that Keiser and other witnesses have attested to Candland's repeated and frequent use of language which may be construed as evincing age bias against older workers. As noted, under *Fuentes*, a plaintiff may point to evidence that would tend to discredit the employer's proffered nondiscriminatory reason for an adverse action, or adduce evidence, whether direct or circumstantial, that could support a finding that discrimination was more than likely a motivating or determinative cause of the

adverse action.  32 F.3d at 763-65.  In this case, the plaintiff has pointed not only
to evidence that could cast doubt on the Borough's proffered reasons for firing
Keiser, but also to evidence suggesting an atmosphere of ageism in the workplace
felt by Keiser and others.   This evidence, taken in the light most favorable to
Keiser at this stage, would show that Candland had made repeated reference to
Keiser as "old-fashioned", "old school", "antiquated", and "outdated".  (Doc. 38-6,
N.T. 68-69; Doc. 38-13, N.T. 26-29, 36-37, 48, 52-55; Doc. 38-9, N.T. 54; Doc.
38-2, N.T. 95, 99, 101-02, 107-09, 194; Doc. 38-3, Ex. Z.)   Candland also
apparently had issued a written plan that explicitly looked to "replace maturing
staff (with particular focus on replacing leadership)."  (Doc. 38-5, Ex. 2.)   One
former employee, Donald Reisinger, testified about meetings during which Public
Works employees discussed Candland's preference for "younger guys and [to]
have them, you know, be groomed the way he likes to see it instead of, you know,
some of the older ways of thinking . . ."  (Doc. 38-13, N.T. 26.)  Reisinger testified
that employees within the Department expressed fear of being fired because of
their age.  (Id., N.T. 108-110.)  To be sure, Candland either denies having made
such remarks, or he discounts their significance or meaning.  (Doc. 38-4, N.T. 62-
68.)  Nevertheless, there is evidence that could support a finding that such remarks
were made, and made repeatedly, and were in fact being made with respect to

Keiser up until the point at which he filed a formal complaint and, shortly thereafter, was fired.

The Borough vehemently disputes that Candland did, in fact, make such comments and argues that regardless they were simply stray comments that could not support a finding of discriminatory animus. The court disagrees, and finds that the disputed record on this score precludes summary judgment. In other such cases, courts have found that discriminatory comments made by decisionmakers, may constitute direct evidence of age-related animus and provide support for a plaintiff's showing of pretext. *See, e.g., Kargbo v. Phila. Corp. for Aging*, 16 F. Supp. 3d 512, 525 (E.D. Pa. 2014); *see also Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002) (statement of age-related animus by plaintiff's direct supervisor was "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's age in reaching their decision to fire him.") (reversing summary judgment granted to the defendants); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 502 (3d Cir. 1995) (reversing grant of summary judgment to the defendants after finding that a supervisor's statement five months prior to termination that he wanted the plaintiff to lose weight because "it'll make you feel better [and i]t'll make you look younger" was evidence of age-related bias and could support a finding that age discrimination was more likely than not a

determinative factor in the supervisor's decision to terminate the plaintiff's employment).

While we appreciate the vigor with which the defendants advance these arguments, and acknowledged that they have amassed evidence to support their position, given the countervailing evidence proffered by Keiser Candland's rejoinders simply define a disputed issue of fact for trial.  In summary, the court finds that Keiser has made out a *prima facie* case for discrimination under the ADEA, and has pointed to sufficient evidence in the record that could support a finding that the Borough's stated justifications for terminating Keiser's employment were pretextual.  Resolution of the discrimination claim, and the Borough's proffered reasons for firing Keiser, must therefore be resolved by trial.

### B.   Retaliation

Keiser also brings a claim for retaliation, arguing that he was unlawfully terminated for presenting his formal complaint to Candland on May 1, 2014, within hours of the exercise of his right to protest what he alleged was ageist discrimination.  The ADEA prohibits employers from discriminating or retaliating against employees for having made a charge, testifying, assisting, or participating in an investigation, or other proceedings against the employer.  29 U.S.C. § 623(d).  To make out a *prima facie* case of ADEA retaliation, a plaintiff must show that (1) he engaged in ADEA-protected activity; (2) the defendant took an adverse

28

employment action against the plaintiff after the plaintiff engaged in protected activity; and (3) a causal relationship exists between the plaintiff's protected activity and the defendant's adverse employment action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 191 (3d Cir. 2015); *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Fogleman v. Mercy Hosp., Inc.*, 283, F.3d 561, 567-68 (3d Cir. 2002)).  If the plaintiff makes these showings, then the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action.  *Id.*  If the employer offers such a reason, the burden returns to the plaintiff to demonstrate that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Marra*, 497 F.3d at 300.  Although the burden of production shifts back and forth between the parties, the plaintiff always carries the burden of persuasion.  *Daniels*, 776 F.3d at 193 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

In this case, the Borough seems to concede for purposes of summary judgment that the plaintiff has made out a *prima facie* case of retaliation, since he provided Candland with a formal complaint about alleged ageist comments and criticisms following their meeting on May 1, 2014, hours before he was fired. Nevertheless, the Borough argues that the plaintiff is simply attempting to manufacture a retaliation claim where none exists, since according to the defendant

"[t]here were two outs in the ninth inning[2] when the meeting on May 1 was to commence.  By the time Keiser handed over his complaint of age discrimination, the meeting and the game had been called."  (Doc. 36, at 17.)   In short, the Borough argues that Keiser's firing had nothing to do with his formal complaint, as it was already planned, and therefore the temporal proximity is a red herring.

The Borough thus urges the court to discount the evidence of temporal proximity at summary judgment, and instead to conclude on the disputed record that (1) Keiser is unable to show that he would not have been terminated but for his protected activity, and (2) that the Borough had already planned to terminate the plaintiff's employment and was not obligated to suspend that plan simply because Keiser took the opportunity to make a complaint.  (Doc. 36, at 17-20.)

Keiser maintains that he has come forward with more than sufficient evidence to warrant a trial on his retaliation claim.  First, Keiser points to cases standing for the familiar proposition that temporal proximity between protected activity and an adverse employment action that is "unusually suggestive" is typically sufficient to create a genuine issue of material fact for a jury's consideration.  *See, e.g., LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d

---

[2] This baseball metaphor is an elusive one for the defendants, since it also calls to mind the dropped third strike rule, which permits a batter, in this case the plaintiff, to advance if the catcher drops the ball on even the third called strike. In other words, in life, litigation and baseball we are all well-advised to keep in mind that "It ain't over till it's over." Yogi Berra.

217, 232 (3d Cir. 2007); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000) (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)). These cases lend support to the argument that close proximity between protected activity and adverse action is especially probative of causality, and the plaintiff thus argues that because he was fired just hours after complaining to Candland, the temporal proximity is highly suggestive of causation in this case.

We agree with Keiser that this evidence, taken in the light most favorable to him as the non-moving party, raises material issues of disputed fact that need to be heard and resolved by a jury.  In many cases, temporal proximity of a matter of days or a little more than a week may be sufficient to demonstrate causation, and sometimes even a period of a few months.  *See Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005) (reversing grant of summary judgment on retaliation claim and finding temporal proximity where employee's grievance was denied less than three months after he filed charges with the EEOC); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003) (ten days); *Jalil*, 873 F.3d at 708 (reversing grant of summary judgment where plaintiff was terminated two days after the protected activity).  The temporal proximity in this case is, by any measure, unusually close.  The court cannot simply look past the fact that Candland fired Keiser hours after Keiser formally complained.  *See LeBoon*, 503 F.3d at 232 ("Where the temporal proximity between the protected activity and the adverse

action is unusually suggestive, it is sufficient alone to create an inference of causality and defeat summary judgment.").

Furthermore, courts have found that a plaintiff may also prove causation by showing a pattern of antagonism coupled with timing to establish a link. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Farrell*, 206 F.3d at 281.  In this case, we have already noted that the record contains some evidence that Candland had made comments that many employees, including Keiser, had interpreted as evincing an age-based bias against older workers, and this evidence coupled with the timing of the adverse action lends further support for the court's finding that the plaintiff has presented sufficient evidence in support of his retaliation claim to get past summary judgment.

Finally, although the Borough attempts to cast Candland's decision to fire Keiser as one that had been made well in advance of his formal complaint, at best the evidence on this score is equivocal.  For his part, Candland testified that he had decided "probably halfway through" his meeting with Keiser that he would fire him, but concedes that there is no documentary or other evidence that could substantiate this plan.  (Doc. 38-4, N.T. 223.)  Keiser casts further doubt on this assertion by noting that he had not been disciplined at any point during the time when he reported to Candland, including about the three reasons given by Candland on May 1, 2014.  Perhaps most probative, however, is other evidence

that would tend to contradict the assertion that there was a plan to fire Keiser before he complained.

As noted above, the Borough Council met in Executive Session on April 28, 2014, just three days before Keiser was fired.  All of the Borough's elected officials were present at this meeting, along with Candland.  (Doc. 38-8, N.T. 33.) Two members of that Council, Linda Cecconello and Donald Grell, have been deposed in this case.  Each testified that Candland reported during this meeting that there was no plan to terminate Keiser's employment.  The issue had arisen as part of a discussion of Candland's overall view of Keiser's performance, and because of a recent local story about a dispute between Keiser and his neighbor. Cecconello testified unequivocally that Candland told her and the others that there was no plan to terminate Keiser:  "We were told [by Candland] that Mike's job was not in jeopardy . . . That was a direct quote."  (Doc. 38-9, N.T. 71-74.)  Grell testified similarly:  "Matt was going to be meeting with Mike and nothing was going to happen and about two days later we found out that Mike was terminated." (Doc. 38-8, N.T. 33.)

Moreover, there is evidence that would show that Candland had planned to meet with Keiser on May 2, 2014, to address the issue between Keiser and his neighbor that had garnered local media attention.  (Doc. 38-5, Ex. 19.)  Keiser argues that this evidence provides further reason to doubt the Borough's position in

this litigation that there were "two outs in the ninth" by the time Keiser filed his formal complaint, since it might strike a factfinder as inconsistent for a supervisor to schedule a meeting with an employee to be held the day after he was fired if a plan had actually been in place to terminate his employment on an earlier date.

As the foregoing demonstrates, Keiser's retaliation claim, like his discrimination claim, is not capable of being resolved at summary judgment, as there remain numerous disputed issues of fact that are material to each claim.

## V.   CONCLUSION

Accordingly, for the foregoing reasons, the defendant's motion for summary judgment will be DENIED.  An Order consistent with this Memorandum will issue separately.

*/s/  Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated:  February 24, 2017